No. 36,724

HELMERICK & PAYNE, INC., *Appellee*, v. THE BAY·PETROLEUM
CORPORATION, *Appellant*.

(181 P. 2d 324)

ROBERT GARVIN, judge. Opinion filed June 7, 1947.

*J. B. Patterson,* of Wichita, argued the cause, and *A. W. Hershberger, Enos E. Hook, Richard Jones, Wm. P. Thompson,* all of Wichita, and *Wayne H. Lamoreux,* of Great Bend, were with him on the briefs for the appellant.

*Jack N. Hays,* of Tulsa, Okla., argued the cause, and *R. C. Russell, Isabel Obee,* both of Great Bend, *Frank Settle, Eugene O. Monnet* and *Sam Clammer,* all of Tulsa, Okla., were with him on the briefs for the appellee.

The opinion of the court was delivered by

HOCH, J.: This was an action to recover amounts alleged to be due under well-drilling contracts. On one cause of action, the jury was unable to agree. On a second cause of action, the trial court directed a verdict in favor of the plaintiff. The defendant oil company appeals, asserting that the trial court erred in overruling its demurrer to the evidence on the first cause of action, and in directing a verdict for plaintiff on the second cause of action.

The essential facts may be briefly stated. In November, 1943, the appellee Helmerick & Payne—a corporation engaged in the business of drilling oil wells—entered into a written contract with appellant, The Bay Petroleum Corporation, to drill a well on a lease held by Bay in McPherson county. Under the terms of the contract, the appellee was to furnish at its risk and expense all drilling equipment and labor, and the appellant was to furnish all necessary casing, cement, well control and production equipment, welding—except on appellee's equipment—special mud materials not normally required, and certain other items not necessary to enumerate.

A well, designated Carter-Carlson No. 1—hereinafter referred to

as Well 1—was begun, but was not completed to the agreed depth. A second well, known as Carter-Carlson No. 1A—and hereinafter referred to as Well 1A—was then drilled to completion. Bay refused to pay for the work done on Well 1, uncompleted. The undisputed amount due for drilling Well 1A was $12,014.84. From this amount, Bay withheld $3,785.85, asserting that it had been put to unnecessary expense in that amount as a result of improper drilling methods employed on Well 1. In the action by the well-drilling company which followed, the plaintiff sought, in the first cause of action, to recover for the expense of drilling the uncompleted Well 1, and in its second cause of action, to recover the unpaid balance on Well 1A.

The controversy as to uncompleted Well 1 turned upon the question of whether the abandonment prior to completion was directed by appellant, and without fault on the part of appellee, or whether the hole was "lost" by appellee, in which case no payment would be due. The issue involved in the appeal from the order directing a verdict for plaintiff on the second cause of action will be stated later.

As to abandonment of Well 1 and the circumstances leading up to such abandonment, appellee's petition contained the following allegations:

"That thereafter said plaintiff moved in its tools and commenced actual drilling with rotary tools of said test well upon said lands within the time and at the location mentioned in said contract, and thereafter continuously drilled the same with due diligence to an approximate depth of 305 feet, which was reached on November 28, 1943. That in accordance with the terms of said contract said defendant was to furnish all casing to be set in said hole when and as needed, and said defendant had, prior to said November 28, 1943, delivered at the well location 305 feet of 8⅝ inch casing. That at the time said hole was drilled to said approximate depth of 305 feet, H. M. Myers, the daylight driller in charge of the drilling of said well for said plaintiff, got in touch with Mr. Forrest Crawford, the District Superintendent of Defendant in charge of the drilling of its wells in the district in which said well was being drilled, and with full power and authority to represent said defendant company in all matters relative to the drilling of said well, and told him that in that locality where said well was being drilled there is a very porous formation encountered between the approximate depths of 300 and 380 feet, which was so porous that same usually and normally could not be drilled with rotary tools without casing off the same, because the formation would absorb the rotary mud and stop mud circulation necessary to rotary drilling; that the defendant company had then only furnished 305 feet of 8⅝ inch casing to case off said formation and that approximately 375 to 380 feet of said casing should be furnished. Said Crawford then told said Myers that the defendant company did not desire to run but 305 feet of 8⅝ inch intermediate casing in said well, that the risk and responsibility for setting an inadequate amount of said casing in the hole was

on the defendant and for him to go ahead and run the same and make arrangements for the defendant with the cementing company to have same cemented in the hole. That thereupon said Myers informed Crawford that plaintiff company would not run that small amount of casing in the hole as it would most probably not be sufficient to case off the dangerous porous formation found at the depth above stated, and would probably cause the loss of the hole. Whereupon said Crawford told Myers that the risk and responsibility of running said shorter string of casing would be upon the defendant company if anything happened to the hole because of the same and ordered and authorized him to run and cement said 305 feet of 8⅝ inch casing in said hole, and that if same was insufficient the loss would be on the defendant company. That thereupon Myers told said Crawford that under those conditions only, he would run the casing in the hole and have same cemented, but that if anything happened to the hole because of the same, the liability and loss therefor would be at the risk and expense of defendant company and said Crawford then and there agreed to the same.

.“That after said 305 feet of 8⅝· inch casing had been run and cemented in said hole said plaintiff resumed the drilling thereof with rotary tools, drilled out the cement plug in said casing and drilled said hole to a depth of 784 feet, at which time circulation was lost through the porous formations (which should have been cased off) found in said hole between the depth of 305 and approximately 380 feet; which caused plaintiff to cease drilling. That thereafter said plaintiff attempted to cement off said porous formations (which caused the loss of said circulation and cessation of said drilling) and put said well in condition so that drilling could be resumed; but up until December 13, 1943, had been unable to condition the well so that drilling could be resumed and the hole completed. That on or about December 13, 1943, the said Forrest Crawford ordered said plaintiff, by and through its duly authorized drilling superintendent for that district, C. R. Smith, to plug and abandon said well, skid over and commence and drill another well close by. That an itemized statement of plaintiff's actual expense of moving in, rigging up, drilling and plugging said first well is hereto attached, marked Exhibit 'B' and made a part hereof; and said defendant is indebted to said plaintiff in said amount plus 15 percent thereof.

“a. That the amount of 8⅝ inch casing (namely, 305 feet thereof) furnished by the said defendant for use in drilling said well, was, for the reasons above stated, wholly inadequate for that purpose, and because of that fact, and that fact only, said plaintiff was unable to complete and drill the same to contract depth and said defendant so ordered same plugged and abandoned.”

Under these allegations, appellee sought recovery for expenses incurred upon incompleted Well 1, resting its claim principally upon paragraph 14 of the drilling contract, which was as follows:

“14. PREMATURE ABANDONMENT. Bay reserves the right to require Contractor to stop drilling and either complete or abandon test well at any time or depth. If abandonment or completion is ordered, before a depth of twenty-five hundred (2500) feet has been reached, Bay shall pay Contractor

for Contractor's actual expense of moving in, rigging up, drilling, plugging or completion and dismantling the tools plus fifteen percent (15%) of such sums, or at Contractor's option, Bay shall pay at the herein specified footage price for actual footage cut or made."

In its answer appellant alleged:

"That in the drilling of said test well described in said petition as Carter-Carlson No. 1, said plaintiff was guilty of negligence in that said plaintiff attempted to drill said well and make hole therein *at a speed and rate which was excessive when measured by customary and efficient practices in the drilling of such oil wells,* and in so doing *put too much weight on the drill stem* of said drilling equipment and as result thereof caused the breaking and rupturing of the surface pipe furnished by said defendant. That said plaintiff by the exercise of due care knew or should have known that *said excessive speed and excessive weight* put upon said drill stem would result in damage to and breaking of said pipe." (Italics supplied.)

It then alleged that "by reason of the negligence of said plaintiff and the resultant break in said pipe," it was damaged in the sum of $3,785.85 because of loss of casing, the expense of cementing, of welding, of plugging the abandoned hole, *et cetera,* and that such amount was accordingly withheld from payment on Well 1A. Appellant contends that it owes nothing for the drilling of Well 1, uncompleted, and stresses the provisions of paragraph 16 of the contract, which reads as follows:

"16. LOSS OF HOLE. Should test hole be lost before contract depth is reached, Contractor shall move tools to a new location designated by Bay as a reasonable distance from lost hole and proceed with the drilling of another test well under the terms of this contract. Contractor shall not be entitled to any payment from Bay under the terms hereof for any footage made or work done in such lost test hole."

Narrowly stated, the question is whether there was any substantial evidence to support appellee's contention that Well 1 was ordered abandoned by the appellant and that such abandonment resulted from appellant's failure to furnish the required casing as alleged. Our examination of the record convinces us that there was ample evidence of that sort to require submission of the question to the jury, and that appellant's demurrer to the evidence as to the first cause of action was properly overruled. We need only summarize some of the evidence which tended to support appellee's allegations, above recited.

Craig, testifying as general production superintendent for the Bay company, testified that Crawford was "production foreman" for the company throughout the state of Kansas, and that his orders were

carried out by Crawford. Crawford testified that he took his orders from Craig and transmitted them in the field. Smith testified that he was drilling superintendent for appellee, and in charge of drilling wells in Kansas, and that prior to the instant contract he had drilled two or three other wells for Bay, the appellant; "that Mr. Crawford informed us how much casing to set and where to set it in these other wells."

Meyers, driller in charge for appellee, testified:

"A. Well, I put in a call for Mr. Crawford—I put one in for Mr. Craig for Wichita and couldn't get in contact with him—placed a call for Mr. Crawford in Lyons and couldn't contact him at that time, but he called back, and answered the call later, two or three or four hours later, maybe it was—I don't remember just how much it was, but I told him we didn't have enough pipe to reach the anhydrite formation that was presumably the first solid formation to set the 8⅝ inch casing in, and he asked me how much I had, and I said 305 feet, and we should have between 360 to 375, somewhere in that neighborhood, and he said, 'Well, that is all; you have got as much pipe as we sent to the other well out there drilling south of us, and I believe that will be enough pipe for you, so go ahead and run it.'

. . . . . . . . . . . . . . .

"A. Well, I told him that we had lost circulation when we were cutting our first well there, and continued to lose it while we was reaming the hole for the 8⅝, and that we would run into trouble if we tried to cement that pipe in that porous formation.

"Q. Did you say anything about how much pipe you thought you ought to have? A. I told him I thought we should have between 360, 70, 75 feet. That is what I had been warned against when I went over there to drill it, to be sure and set it in a solid formation.

"Q. After you had this conversation with Mr. Crawford, what did you do next on the well? A. I went ahead and run the 8⅝ inch casing.

"Q. Was the 8⅝ cemented? A. We cemented it, but we couldn't tell whether or not we had got a cement job on it until after we gave it a chance to set and went back in and tried it.

"Q. You say we cemented it; as a matter of fact, wasn't it the Halliburton Oil Well Cementing Company that cemented it? A. Yes, sir, Halliburton cemented it."

Meyers then testified at length concerning later cementing operations carried on in an attempt to restore circulation and complete the well. On cross-examination he testified:

"I called Crawford and told him we lacked 60, 70 or 75 feet of having enough pipe to case off the structure. I told him that was needed on account of the circulation lost at 250 feet. At that time we were still in that formation at 305 feet. I don't remember exactly what I told him. I just told him

we had lost circulation and that we should have enough pipe to go down to where it was solid enough to set.

"A. I just set in every bit of pipe I had, right in this soft formation.
"Q. Just let it hang? A. Yes.
"Q. What did you think that would do? A. I knew what it would do.
"Q. Yet you went ahead and did it. A. I did.
"Q. Why did you go ahead and do it? A. Orders from Crawford."

Simpson, tool pusher for appellee and employed on the drilling of the wells in question, testified:

"I had a conversation with Mr. Crawford, of Bay, regarding the 8⅝ inch string of casing in the Carlson well. . . . I told Mr. Crawford what the driller had told me about the amount of pipe he had there. I told him it was something over 300 feet of pipe and I didn't think it was enough pipe. He seemed to think it was and I told him we would probably have loss of circulation trouble if we didn't set in the anhydrite, and he still said that it was all the pipe we were going to get, and I called Mr. Meyers and told him that was all the pipe Bay would furnish and we would have to run what they had furnished.

"I am the one who is supposed to make personal contact with the wells unless my superior, Mr. Smith, does. It is customary for the tool pusher, if he can, to be present on a well whenever circulation is lost. I had two fishing jobs at the time and I thought they were more important than the well which had the lost circulation, because I had Halliburton over there and they could do all I could. I talked it over with Crawford and I suggested what we could do, and he didn't seem to know anything else we could do, and I told him that is what we would do. We would just keep filling it up with cement to get it shut off. That was after circulation was lost. Halliburton are experts in the matter of drilling wells and their judgment should be trusted. I do not know of anything I could have done to have saved the well if I had been there."

As to plugging Well 1 and "skidding" to a new location forty feet north, Smith, appellee's drilling superintendent, testified:

"I gave orders to Meyers to plug the hole and to skid it 40 feet north. Prior to those orders to Meyers, I had a conversation, either with Mr. Craig or Mr. Crawford, over the telephone. This conversation must have been the day before we skidded.

"A. I talked to him about what they wanted to do, and he said 'Skid it forty feet north.'
"Q. Wanted to do in regard to what well? A. Carlson 1.
"Q. And they said 'Skid it'? A. Skid it forty feet north."

Objection was made to this testimony on the grounds that the witness couldn't say positively whether the conversation was with

Craig or Crawford, and that Crawford had no authority in the matter. The testimony was properly received as there was substantial evidence to justify appellee in accepting directions from either Craig or Crawford.

Lastly, as to the first cause of action, the appellant invokes the doctrine of mitigation of damages, asserting that if additional casing was required to reach through the porous formation and appellant refused to furnish it, the duty was then upon appellee to secure such additional casing upon its own initiative. The contention requires no extended comment. Under the contract, all necessary casing was to be furnished by appellant. According to plaintiff's testimony, the appellant was advised as to the need of additional casing but took the position that sufficient casing had been furnished, and appellee proceeded, attempting to set the casing furnished under direction from the appellant. We are here concerned only with plaintiff's testimony, as against the demurrer, and we find nothing in that evidence which would require the trial court to sustain the demurrer on the ground that appellee had a duty which it did not perform. Appellant sets out in the abstract the instructions given and those relating to mitigation of damages which were requested and refused. But questions there involved are not here for review since the jury was unable to agree, no judgment was entered, and of course there was no motion for a new trial as to the first cause of action.

We come to the second cause of action, for recovery of unpaid balance on the drilling of Well 1A. The issues of fact are closely connected with those involved in the first cause of action. We are convinced that the trial court construed too strictly as against appellant the allegations of the answer, as well as the evidence offered in support of those allegations.

The allegations of the answer have been hereinbefore noted. It is urged that appellant only alleged that the drilling on Well 1 was done "at a speed and rate" which was excessive, and that there was no direct evidence on the question of speed and rate, and therefore nothing to submit to the jury. But the answer further alleged that "in so doing *put too much weight on the drill stem* of said drilling equipment and *as result thereof caused the breaking* and rupturing of the surface pipe furnished by said defendant. That said plaintiff by the exercise of due care knew or should have known that *said excessive speed and excessive weight* put upon said drill stem

would result in damage to and breaking of said pipe." (Italics supplied.)

Without reviewing all the testimony, much of which deals with technical matters in connection with drilling operations, we call attention to some testimony with reference to how circulation was lost, as bearing upon the above allegations.

Herring, a consulting geologist and engineer with many years of practical experience, testified as follows:

"Well, generally speaking, in a rotary well, rotary hole, I could think of—of course, there might be others—but the pipe, as it turns, is flexible. It is just like a string of macaroni, when you think about it as hanging down in the hole and turning, and when you let the weight of it just rest on the bottom, even all of it or even some portion of it, it bows out. It hasn't got any place else to go. It is just like a snake. That pipe, while it might not look flexible, is, and when you start turning it around at say 100 or so revolutions a minute, so every time it goes round, it slaps this pipe a good hard bang, and I think that knocks a hole in the pipe.

"Q. Is it your opinion that is what happened in this case? A. Yes, I think it is."

When questioned as to whether that was good drilling practice, he was not permitted to answer the question, the trial court taking the position that the answer contained no charge of any improper drilling practices. We think the trial court construed too strictly the allegations above quoted.

Hoisington, a duly qualified witness, testified in part:

"The very fact that they had to run so many cementing jobs under the conditions existing in the well at that time, definitely and positively indicates that the hole, or the casing, or both, was not made and placed in such a manner that it would permit successful progress of the drilling of the well. That is obvious. . . . In the course of the drilling, they had some, at least 6,000 pounds of drill pipe and kelly joint, grief stem, on top there, that was rotating probably 100 revolutions a minute, and in getting around this bend, your casing was taking a considerable beating, hammering, and it appears in the records here that that was at approximately 252 feet."

Wynn, a cementer with long experience, and employed on the job at Well 1, testified at length as to the conditions found at the well. He testified:

"A. Mr. Crawford asked Mr. Meyers how he was getting along; and he said. Mr. Meyers said, 'Well, not very well.' I believe Mr. Crawford said something to the effect, 'Well, what seems to be the trouble.' Mr. Meyers' answer, I believe, was that he was cutting a new hole. I don't remember Mr. Crawford's exact words, I can't remember just exactly how he put it—

"Q. Just give the substance of it. A. In substance it is, 'You have evidently knocked the casing off'."

Defendant's evidence as to the cause of loss of circulation in Well 1 fell within a reasonable interpretation of the allegations of the answer. The parties stipulated that the expense incurred by the defendant in attempting to save the well was the amount claimed by defendant by way of set-off against payment on Well 1A. We conclude that the trial court erred in directing a verdict for plaintiff as to the second cause of action.

The order overruling the demurrer to plaintiff's first cause of action is affirmed. The order directing a verdict for plaintiff on the second cause of action is reversed.